# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-4266

VENDETTA JACKSON,

*Plaintiff-Appellant,*

v.

CITY OF CHICAGO,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 3057—**Milton I. Shadur**, *Judge.*

_____

ARGUED OCTOBER 28, 2004—DECIDED JULY 12, 2005

_____

Before RIPPLE, WOOD and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Vendetta Jackson brought this action
against her former employer, the City of Chicago ("the
City"), for violations of Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12111 et seq., and of
section 504 of the Rehabilitation Act of 1973 ("Rehabilitation
Act"), 29 U.S.C. § 794. The district court granted the City's
motion for summary judgment on the ground that
Ms. Jackson could not raise a genuine issue of material fact
as to whether she was a "qualified individual with a disa-

bility" as defined in 42 U.S.C. § 12111(8). Ms. Jackson appealed to this court. For the reasons set forth in the following opinion, we now affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

Beginning in 1985, Ms. Jackson was employed by the City as a police officer. Shortly after beginning work, she injured her right knee in a training exercise and underwent an outpatient arthroscopy, but she continued to work as a police officer on convalescent duty status. In 1987, Ms. Jackson returned to full duty status with no restrictions. She underwent knee surgery in 1992 and, in 1993, successfully applied for total duty disability benefits from the Retirement Board of the Policemen's Annuity and Benefit Fund ("the Board"). In 1995, the Board found that Ms. Jackson's disability had terminated and ceased her total duty disability benefits. She then returned to active duty in a limited duty capacity.

In 1998, Ms. Jackson applied again to the Board for disability benefits. She claimed that her knee injury, along with back pain and fibromyalgia, prevented her from performing even limited police duties. In conjunction with Ms. Jackson's 1998 application for disability benefits, the Board heard testimony from Dr. David Demorest, the Board's medical advisor who reviews medical claims for disabilities. Dr. Demorest testified that he had reviewed Ms. Jackson's file, which included the report of her orthopedic surgeon, Dr. Bernard Bach. Dr. Demorest concluded that Ms. Jackson was

able to continue to perform limited duty with the police department. The Board then denied Ms. Jackson's disability claim.

While administrative review of her claim for benefits was still pending, Ms. Jackson sought to be reinstated at the police department. She was directed to contact the police department's Medical Service Section ("MSS"), which arranged for Ms. Jackson to undergo a physical examination conducted by United States Occupational Health ("USOH"). USOH administered a resting electrocardiogram ("EKG") but, due to Ms. Jackson's injury, did not administer a stress EKG. MSS also received correspondence from another of Ms. Jackson's treating physicians, Dr. Carey Dachman. Dr. Dachman's letter stated that, due to Ms. Jackson's back pain and fibromyalgia, she could not resume her duties as a police officer.

The City did not allow Ms. Jackson to be reinstated. The City corresponded with Ms. Jackson, through her attorney, to explain what needed to be done in the reinstatement process. Beginning in September of 2000, the City wrote several letters to Ms. Jackson's counsel, outlining the steps Ms. Jackson would need to take in order to be reinstated.

In April 2002, the City informed Ms. Jackson that, because her benefits claim was no longer pending, the City would accept her resignation unless she took some action. Ms. Jackson did not respond. She filed the complaint in this action on April 30, 2002. The City made her resignation formal in May 2002.

## B. District Court Proceedings

The district court granted the City's motion for summary judgment on the ground that Ms. Jackson had not raised a

genuine issue of material fact as to whether she is a "quali-fied individual with a disability" as defined by the ADA. *See* 42 U.S.C. § 12111(8).

The court concluded that Ms. Jackson's fibromyalgia constitutes a physical impairment for purposes of the ADA and determined that a reasonable jury could conclude that her fibromyalgia substantially limits Ms. Jackson in the major life activity of walking.[1] The court then turned to the question of whether Ms. Jackson is a qualified individual with a disability; that is, whether she could perform the essential functions of the job with or without reasonable accommodation.

The district court looked to the City's designation of the "essential functions" of the job, in particular the require-ment that police officers be "able to handle a firearm adequately." R.30 at 13. The district court determined that Ms. Jackson could not perform the essential functions of the job without reasonable accommodation, noting that Ms. Jackson had "fail[ed] to demonstrate her ability to handle a firearm as part of her reinstatement evaluation in 2000," and that Ms. Jackson's physician, Dr. Dachman, had "expressly testified that it would be hazardous to her health and the health of those around her" if Ms. Jackson carried a gun. *Id.*

The district court also considered whether Ms. Jackson could perform the essential functions of the job with rea-sonable accommodation as defined by the ADA. *See* 42 U.S.C. § 12111(9)(B). The court noted that the ADA "allows for the possibility" that Ms. Jackson could be given "the reasonable accommodation of reassignment to another posi-

---

[1] The district court determined that Ms. Jackson's knee injury, on the other hand, did not support a finding that she was disabled.

tion within [the] City where handling a firearm is not an essential function." *Id.* at 14. However, the court determined that the City had fulfilled any obligation it had to provide Ms. Jackson with a reasonable accommodation "by repeatedly notifying Jackson that she could apply for reassignment pursuant to [the] City's standard policy." *Id.* at 15. The court concluded that Ms. Jackson was responsible for any breakdown in the dialogue between the parties regarding reassignment.

Ultimately, the district court held, no reasonable jury could conclude Ms. Jackson is a qualified individual with a disability under the ADA because she could not perform the essential functions of the job without accommodation and because she had failed to participate in "the standard reassignment process offered to her by [the] City more than once." *Id.* at 17. Thus, the district court granted summary judgment for the City.

## II

## ANALYSIS

### A.  Standard of Review

We review de novo a district court's grant of summary judgment. *See Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## B. Statutory Framework

"The ADA and Rehabilitation Act prohibit an employer from discriminating against a qualified individual with a disability because of the disability." *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). In order to make out a prima facie case of discrimination under both the ADA and the Rehabilitation Act, a plaintiff must show: (1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability.[2] *See id.* at 798 n.6. In order to determine whether the Rehabilitation Act has been violated in the employment context, we refer to the provisions and standards of the ADA. *See* 29 U.S.C. § 794(d); *see also Branham*, 392 F.3d at 902.

The district court determined that Ms. Jackson is an individual with a disability: A reasonable jury could find that Ms. Jackson's fibromyalgia substantially limited her in the major life activity of walking. This analysis is unchallenged. Thus, in this appeal, the parties dispute only whether Ms. Jackson was "qualified." We shall confine our discussion to that aspect of the prima facie case.

---

[2] The showing required to make out a prima facie case under the Rehabilitation Act differs from the showing required under the ADA only in that a plaintiff must, in order to prove a violation of the Rehabilitation Act, make the additional showing that she was involved in a program which received federal financial assistance. *See Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). The parties do not dispute that this description applies to the City.

### C. Qualified Individual with a Disability

The ADA defines a qualified individual with a disability to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The statute explicitly gives "consideration" to "the employer's judgment as to what functions of a job are essential." *Id.* Furthermore, "if an employer has prepared a written description . . . , this description shall be considered evidence of the essential functions of the job." *Id.*

We agree with the district court that the City has established that, among other considerations, the ability to handle safely a firearm is an essential function of the position of a sworn police officer. The "MINIMUM ELIGIBILITY REQUIREMENTS" of the "SWORN LIMITED/CONVALESCENT DUTY PROGRAM" show that even a police officer assigned to "limited/convalescent duty" must be able to "safely carry, handle, and use [her] Department approved, prescribed firearm." R.19, Tab G, Ex.1 at 1. A police officer, including one on "limited/convalescent duty," also must be able to "maintain an independent and stable gait." *Id.* We shall not "second-guess the employer's judgment as to the essential functions" of a position. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). In any event, Ms. Jackson does not appear to dispute that being able to maintain an independent and stable gait and to carry safely a firearm are essential functions of the police officer position.

### 1.

Ms. Jackson contends that she is capable of performing the essential functions of the job without any accommodations.

The City, on the other hand, contends that Ms. Jackson has failed to raise a genuine issue of material fact as to whether she can perform the essential functions of the job without any accommodation.

Dr. Dachman, Ms. Jackson's own physician, notified MSS in writing that Ms. Jackson was being treated for fibromyalgia. In that correspondence, he included the handwritten message that, "due to her ongoing pain/fatigue—she cannot resume her dutys [sic] as a police officer." R.19, Tab B, Ex.6 at 1.

Later, in deposition testimony, Dr. Dachman stated that he did not believe that "somebody with fibromyalgia and back pain would be safe in the streets either to herself or to a civilian in reference to . . . trying to pull the trigger." R.19, Tab N at 11. He further stated that Ms. Jackson "would be both a danger to herself and to me as a civilian because of her diffuse pain, her instability of gait, her fatigue, the effects of fatigue and cognition." *Id.* Dr. Dachman also specifically noted his opinion that Ms. Jackson is not able to carry a gun, regardless of any of the other duties of her position: "[I]t's irrelevant to my mind what she is assigned to do on a daily basis in that if she has to carry a gun, to me that would be hazardous to her health and those around her." *Id.* at 24. He felt that a gun would be too heavy for Ms. Jackson to wear on a regular basis.

Ms. Jackson contends that Dr. Dachman's opinion regarding her ability to handle safely a firearm should not be dispositive of the question whether she can perform the essential functions of the job without accommodation. She contends that the opinions of other physicians show that she is capable of returning to work. For instance, she contends that Drs. Bach and Demorest opined that she could perform light duty. She submits that the district court cannot, on

summary judgment motion, weigh conflicting evidence. *See Babrocky v. Jewel Food Co. & Retail Meatcutters Union*, 773 F.2d 857, 861 (7th Cir. 1985).

However, as the City points out, the opinions of Drs. Bach and Demorest do not contradict Dr. Dachman's opinion regarding Ms. Jackson's ability to handle a firearm; they both conclude that she may return to some form of light duty but do not discuss her fibromyalgia. Thus, we cannot be certain that they even considered it. On this record, we must conclude that Ms. Jackson has failed to show that there is a genuine issue of material fact as to whether she can perform, without accommodation, the essential function of safely handling a firearm.[3]

---

[3] Ms. Jackson submits that *Buttitta v. City of Chicago*, 9 F.3d 1198 (7th Cir. 1993), required the City to give her a full medical examination or to ask her to qualify with a weapon at a firing range. However, we do not believe that *Buttitta* controls our review in this case. In *Buttitta*, which concerned an officer's claim that he had been denied due process in connection with the deprivation of a property interest, this court held that, after the Board makes a finding that an officer's disability has ceased, the officer must be returned to the police department for an opportunity to "demonstrate [her] fitness for active duty." *Id.* at 1204. This court construed a provision of Illinois' pension code to mean that "a disability ceases only if the Board and the [police] department agree to that effect." *Id.* As we shall discuss in greater detail below, Ms. Jackson failed to participate in the interactive process which would have allowed the police department to conclude whether she was fit for active duty. However, she had the opportunity to demonstrate her fitness and, therefore, the principles underlying *Buttitta* have not been offended.

Ms. Jackson also contends that *Terrano v. Retirement Board of the Policemen's Annuity and Benefit Fund*, 733 N.E.2d 905 (Ill. App. Ct.

(continued...)

The City also contends that Ms. Jackson has failed to raise a genuine issue of material fact regarding her ability to maintain a stable and independent gait. In light of our conclusion that Ms. Jackson has not raised an issue of fact as to her ability to handle safely a firearm, we need not consider whether there is an issue of fact as to her ability to maintain a stable gait.

## 2.

We next shall consider whether Ms. Jackson can perform the essential functions of the position with reasonable ac-commodation. An individual with a disability falls within the definition of a "qualified individual with a disability" if she can perform the essential functions of the desired position with reasonable accommodation. 42 U.S.C. § 12111(8). The ADA obligates an employer to provide a qualified individual with a reasonable accommodation. *See, e.g.*, *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000); *see also* 42 U.S.C. § 12111(9)(B) (listing examples of reasonable accommodations). For instance, an employer may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job she holds. *See Rehling*, 207 F.3d at 1014. However, the employer is not required to "manufacture a job that will enable the disabled worker to work despite his disability." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). "The employer need only transfer the employee to a

---

[3] (...continued)
2000), required the City to identify a position to which she could return. However, as the City points out, that case did not concern an employer's obligation to engage in the interactive process contemplated by the ADA.

position for which the employee is otherwise qualified." *Rehling*, 207 F.3d at 1014 (internal quotation omitted).

The language of the ADA itself demonstrates that a reasonable accommodation is connected to what the employer knows about the specific limitations affecting an employee who is a qualified individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability" (emphasis added)); *see also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("By the statutory language, 'reasonable accommodation' is limited by the employer's knowledge of the disability."). Thus, the federal regulations implementing the ADA contemplate an interactive process between employer and employee in order to determine the appropriate accommodation for a qualified individual with a disability:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3); *see also Rehling*, 207 F.3d at 1015-16.

Typically, the burden of "exploring" reasonable accommodation lies with the employer. *Hansen*, 233 F.3d at 523. However, this court also has held that, when considering the success of the interactive process, we "first look at whether there is a genuine issue of material fact regarding the availability of a vacant position to accommodate" the employee. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). "It is the plaintiff's burden to show that a vacant

position exists for which [s]he was qualified." *Id.* If such a position is available, then the court may consider whether "failure to provide that accommodation was due to a breakdown in the interactive process." *Id.*

We have recognized that there is no "hard and fast rule" for assigning responsibility when a "breakdown" in the interactive process occurs. *Beck*, 75 F.3d at 1135. However, this court has held that, when the parties are "missing information . . . that can only be provided by one of the parties, . . . the party withholding the information may be found to have obstructed the process." *Id.* at 1136.

Ms. Jackson contends that the City failed fully to engage in the interactive process with her, "thereby making it impossible for her to identify what, if any, accommodation she may require." Appellant's Br. at 15. The City, on the other hand, submits that it was not obligated to engage in an interactive process with Ms. Jackson because she is not a qualified individual with a disability in light of the fact that she cannot safely carry and handle a firearm. The City also contends that Ms. Jackson did not properly assert her right to the interactive process.

The record in this case reveals that Ms. Jackson knew of the City's willingness to engage in the interactive process. She received, through her counsel, several letters from the City requesting clarification of Ms. Jackson's ability to return to duty. In a letter dated September 27, 2000, the City explained that, "if Ms. Jackson is claiming that she can perform her position as a police officer with limitations, please describe the nature and extent of her limitations and we will evaluate her for return to duty under the department's limited duty policy." R.19, Tab R, Ex.1 at 2. As well, the City noted that,

if Ms. Jackson contends that she is unable to perform any duties as a police officer, but can perform some other vacant job for the City, please advise and we will forward to her the City's reasonable accommodation request forms and determine whether she is qualified to perform any other currently vacant positions.

*Id.*

In a letter dated October 5, 2000, the City informed Ms. Jackson, through her counsel, that, "[i]f she is requesting to return to work with limitations, she needs to submit medical information from her physicians as to the nature and extent of her limitations." *Id.*, Ex.2 at 1. In a letter dated October 20, 2000, the City advised, "[a]s soon as [she] clarifies whether she can work, and submits medical documentation from her physician . . . , the department will be able to make a decision." *Id.*, Ex.3 at 1.

Ms. Jackson replied to the City's requests only with conclusory statements such as the following: "Officer Jackson is not claiming that she is physically unable to return to work. She is asking to be reinstated." R.19, Tab Q, Ex.3 at 1. Furthermore, Ms. Jackson's counsel's letter of September 29, 2000, did not state Ms. Jackson's physical limitations and did not forward medical records to the City, but noted that "[s]omebody in the Department should be able to make a decision or reinstatement based upon the information that is already available and in the Departments [sic] file," and also noted that "[i]t is . . . the Department, not Officer Jackson, that knows the types [of] positions that may be available to Officer Jackson given any physical limitations she may have." *Id.* In light of this evidence, we must agree with the district court's determination that Ms. Jackson was responsible for the breakdown in the interactive process and with the court's subsequent conclusion that she could not claim that the City failed to accommodate her.

In sum, on the record before us, we must conclude that Ms. Jackson is not a person with a disability who, subject to reasonable accommodation, can perform the essential functions of the police officer position. It is clear that being able to carry a firearm safely is an essential function of the police officer position; it is equally clear that, due to her fibromyalgia, Ms. Jackson is not capable of handling safely a weapon. Furthermore, to the extent that Ms. Jackson is claiming that the City has abandoned its obligation to find her a position working for the City outside of the Chicago Police Department, we must conclude that Ms. Jackson failed to engage in the interactive process.

## Conclusion

For the reasons set forth in the foregoing opinion, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*